IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | 8:02CV10 |
| Plaintiff, | ) ) | |
| v. | ) ) | MEMORANDUM OPINION |
| DAVID C. GUENTHNER, and JAY M. SAMUELSON, | ) ) ) | AND ORDER |
| Defendants. | ) ) ) | |

This matter is before the court after a bench trial on April 18-21, 2005. This is an action for injunctive relief and civil penalties filed by the United States Securities and Exchange Commission ("the Commission") against David C. Guenthner and Jay M. Samuelson for alleged securities laws violations in connection with InaCom Corporation ("InaCom"). The Commission alleges fraud in violation of § 10b and records violations under § 13b of the Securities Exchange Act of 1934 ("Exchange Act") 15 U.S.C. § 78j(b); 13b-2; 17 C.F.R. §§ 240.10b, 240.13b2. In particular, the Commission alleges that defendants committed fraud by causing InaCom to overstate its earnings for the third quarter of 1999 in public filings, fraudulently recorded the overstated earnings in its books and records, and lied to auditors to conceal the fraudulent activities. It also alleges that defendant Samuelson aided and abetted such violations.

The Commission's claim of securities fraud involves three allegedly improper or erroneous accounting practices that affected InaCom's third-quarter 1999 financial statements and filings: (1) InaCom's reduction of certain reserves; (2) InaCom's adjustment of certain inventory and accounts-payable discrepancies and the posting of

those adjustments to third-quarter 1999 financial statements; and (3) InaCom's recognition of "bid price arbitrage" ("BPA") receivables in third-quarter 1999.[1]   The Commission contends these accounting practices violated Generally Accepted Accounting Principles ("GAAP").[2]

## I.  FINDINGS OF FACT

The parties have stipulated to the following facts.   *See* Filing No. 141, Order on Pretrial Conference at 2-4.   InaCom Corp., a Delaware Corporation headquartered in Omaha, Nebraska, was a provider of information technology products and services.   As part of it business, InaCom purchased computer equipment from major manufacturers for resale to end-users.   InaCom merged with Vanstar Corporation, another provider of information technology products and services, in February 1999.   During the late 1990s, traditional computer manufacturers who had distributed their products through resellers such as InaCom experienced significant price competition from direct sale manufacturers. As a result, the traditional manufacturers established "special bid" rebate programs to effectively compete with the direct sellers for the business of large customers.   The traditional manufacturers also established various price protection programs.   Under these

---

[1]BPA is a term coined by InaCom's management to account for special bid contracts or agreements that would provide rebates to Inacom in the event of a price reduction by a vendor.

[2]"Generally Accepted Accounting Principles are "the conventions, rules, and procedures that define accepted accounting practices" that are promulgated by the accounting profession's Financial Accounting Standards Board.   *United States v. Arthur Young & Co.,* 465 U.S. 805, 811 n.7 (1984). More specifically, GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").   *K-Tel Int'l Sec. Litig. v. K-Tel Int'l, Inc. (In re K-Tel Int'l Sec. Litig.),* 300 F.3d 881, 889 (8th Cir. 2002).

programs, a computer manufacturer would rebate the difference in price for each computer that a reseller held in inventory if it decreased the wholesale price of a computer within a certain time after a computer reseller's purchase.

Defendant David C. Guenthner was InaCom's Chief Financial Officer ("CFO") through November 1999. He was licensed as a Certified Public Accountant ("CPA") in Nebraska from 1974 through 1980, when he allowed his license to lapse because he became a private accountant. Defendant Jay M. Samuelson was the Assistant Corporate Controller from September 1990 through February 2000. Inacom had no corporate controller from mid-1998 through February 2000. Samuelson worked with other InaCom accounting personnel to prepare InaCom's consolidated financial statements. Samuelson has been licensed as a CPA in Nebraska since 1998. His license has been inactive since early 2001.

 InaCom's common stock was registered with the Commission under Section 12(b) of the Exchange Act and InaCom reported on Form 10-K from 1987 through 1998 and on Form 10-Q through the third quarter of 1999. InaCom's common stock was traded on the New York Stock Exchange until trading was suspended in May 2000. Defendant Samuelson did not sign any Forms 10-K or 10-Q filed with the Commission. Defendant Guenthner signed the "management representation" letters that InaCom provided to its accountants, KPMG, in connection with KPMG's review of InaCom's financial statements for each of the first three quarters of 1999.

InaCom reported net (after tax) earnings of fifteen cents per share for the third quarter of 1999. On October 26, 1999, David Guenthner prepared a two-page memorandum entitled "Earnings Analysis" at the request of Gerry Gagliardi, InaCom's

3

newly-appointed Chief Executive Officer ("CEO").  He was assisted by Jay Samuelson.  A conference call that included board members was arranged for October 26, 1999.

On June 16, 2000, InaCom filed for Chapter 11 bankruptcy protection.  Neither Guenthner nor Samuelson personally profited from the alleged misstatements in InaCom's financial statements.  Guenthner did not sell any InaCom stock or exercise or sell any stock options at any time during or subsequent to 1999.

Trial of this action commenced on April 18, 2005.  The Commission presented the testimony of David Guenthner in its case in chief.  Guenthner testified that he was InaCom's CFO from 1987, when the company went public, until late November 1999 when he was relieved of his duties as CFO.  He stated that InaCom had started as Valcom, a division of Valmont.  Bill Fairfield had been Valcom's CEO and later became InaCom's CEO.  Fairfield was replaced as CEO in October 1999.  Guenthner continued to work for InaCom in various capacities until InaCom filed bankruptcy in June 2000.

Guenthner testified that he was responsible for all of InaCom's filings with the Securities Exchange Commission.  He read and reviewed all SEC filings.  He testified that he signed the third-quarter 1999 10-Q and authorized its filing. *See* Trial Exhibit ("Tr. Ex.") 304.  He stated that KPMG reviewed the document and signed off on it.  He also authorized and approved the press release issued October 2, 1999, with respect to InaCom's earnings.  *See* Tr. Ex. 303.  He testified that he is familiar with GAAP.

Guenthner testified that InaCom encountered difficulties in the late 1990s as a result of competitive changes within the computer industry.  He explained that the entry of Dell Computer into the market and the gradual adoption of its business model of direct sales to the consumer exerted pressure on computer resellers such as InaCom.  Accordingly,

4

InaCom's management saw the future of its business progressing to service as opposed to hardware. InaCom merged with Vanstar early in 1999 in order to increase the service end of its business and to acquire more service contracts. In the summer of 1999, Guenthner spoke to analysts in the investment community and gave guidance as to the direction that management thought the company's earnings would be headed. Analysts' expectations with respect to InaCom's earnings for third-quarter 1999 were about thirty cents per share.

With respect to the events leading to the third-quarter filing, Guenthner testified that Jay Samuelson and Paul Draheim reported to him. Draheim was responsible for inventory and had calculated an inventory adjustment in the amount of $15.6 million for the third-quarter 1999. Guenthner also testified that the company maintained operating reserves set by its operating divisions, inventory reserves in each division and corporate reserves, including those that were set up in connection with the acquisition of Vanstar. He reviewed total inventory reserves at the end of each quarter. His understanding of GAAP in connection with reserves was that it was necessary to have a basis or reason for setting the reserves and for reversing them.

Guenthner's original recommendation to the board in the third-quarter 1999 was that InaCom's third-quarter earnings should be twenty-five cents per share. Guenthner and Samuelson had met with then-CEO Bill Fairfield on October 15, 1999, to discuss the financial statements in preparation for the upcoming board meeting. Fairfield agreed with Guenthner's financial analysis. InaCom's Audit Committee also agreed with his recommendation. The twenty-five-cents-per-share figure was based on a reduction of reserves in the amount of $14 million. Guenthner continues to believe that the twenty-five-

5

cents-per-share figure was appropriate under GAAP.  Guenthner learned via e-mail shortly after meeting with Fairfield that Fairfield was being replaced as CEO.

Guenthner testified that Fairfield, the Audit Committee, the Board of Directors, and InaCom's outside auditors, KPMG, were all informed of the proposed reduction of reserves.  The evidence shows that the reserves were discussed at the Audit Committee meeting and that representatives of KPMG were present at the meeting.  Guenthner testified that he believes InaCom had adequate reserves even with a reduction in reserves in the amount of $14 million.  He testified that InaCom had in excess of $116 million in reserves in third-quarter 1999.  The reserves included NYNEX tax reserves and lease closing reserves.  Guenthner testified that the likelihood of needing those reserves had lessened over time.

The Vanstar merger was InaCom's fourth major merger and it had also acquired twenty-five or thirty smaller computer companies.  Guenthner testified that as a result of his experience with mergers he was conservative with reserves.  As time went by and as a merger progressed, the company's reserve needs evolved and it was sometimes appropriate to release unnecessary reserve amounts.  At the time of the third-quarter 1999 report, seven months had elapsed since the Vanstar merger, and it had become clear to Guenthner that there was room in the reserves.  Reserves had declined in the two previous quarters because the reserves had served their purpose: the reserves had been set up to cover expenses that were going to be incurred in connection with the integration of the two companies and those expenses were covered.

As a result of the Vanstar merger, four new directors had become board members.  Guenthner testified that shortly before the board meeting, one of the new directors, John

6

Oltman, called him asking for an analysis of the reserves.  This was close to the time that Bill Fairfield was removed as CEO.  Guenthner then asked the chairman of the Audit Committee, Jerry Auerbach, to prepare the analysis.  *See* Tr. Ex. 313.  The issue of reserves was discussed at the Audit Committee meeting.  *See* Tr. Ex. 100.

At the board meeting on the October 22, 1999, Guenthner defended his position that the twenty-five-cents-per-share earnings figure was appropriate.  After the board meeting, he reported to bankers that the earnings figure would be twenty-five cents per share.  Subsequently, Guenthner was informed that a telephone conference had been scheduled for October 26, 1999, to discuss the third-quarter financial statement.  InaCom's newly-appointed CEO, Gerry Gagliardi, participated in the conference.  During the conference, the board agreed to decrease the amount of the reserves released by seven million, resulting in earnings per share of fifteen cents.  *See* Tr. Ex. 39.

Guenthner admitted that he was upset by the change.  He stated that he was concerned with the company's credibility with the banks if earnings under twenty-five cents per share were reported.  He was also concerned about his personal credibility.

Guenthner testified that he asked KPMG to review the changed financial statements.  Guenthner testified that either earnings figure would be correct under GAAP.  He stated that reserve levels and other contingencies are a matter of judgment, and that in his judgment reserves were adequate under either scenario.  There is no dispute that KPMG signed off on the third-quarter 1999 report before it was filed.

Guenthner testified that the board was also aware that the fourth quarter would be extremely difficult.  Guenthner prepared the press release regarding earnings that was issued on October 26, 1999.  *See* Tr. Ex. 303.  The press release was very negative about

7

the next quarter.  *Id.*  After InaCom publicly announced its earnings, the value of its stock plummeted.  *See* Tr. Ex. 308 (indicating drop in share price from $8.12 on October 26, 1999, to $3.93 on October 27, 1999).

Regarding the posting of bid price arbitrage amounts as receivables, Guenthner testified that bid price arbitrage referred to agreements that salesmen and others at the district level made with vendors to rebate a portion of the price that InaCom had paid for their product if the price went down before InaCom sold it to the ultimate consumer.  These special bid contracts were generally oral agreements, which were not uncommon in the computer industry.  The vendors' incentive to agree to the rebates was InaCom's continued business as a reseller of the vendor's product.  InaCom was a reseller of IBM, Hewlett-Packard, and Compaq computers.  InaCom sold its hardware business to Compaq in early 2000.  When InaCom sold its hardware division to Compaq, the other vendors lost the prospect of future business with InaCom, and thus their  incentive to honor the oral agreements.  *See* Tr. Ex. 14.  Also, changes in management at InaCom resulted in the loss of personal contacts and relationships that would have aided collection of the rebates.  At the time the BPA amount was posted as a receivable, neither the announcement of the Compaq transaction nor the changes in management had occurred.  Guenthner testified that he believed the BPA was collectible.  The 1998 annual audit and the first and second quarter quarterly reports had included amounts for bid price arbitrage posted as receivables and KPMG had approved the audits.  *See* Tr. Ex. 130, 131, 132.  Guenthner also testified that he had no reason to think that the inventory adjustments were in any way improper.  He relied on the calculations that had been provided by Paul Draheim.  He did

8

not know what portion of the inventory adjustment figure should have been posted to the earlier quarters.

Defendant Jay Samuelson also testified.  He essentially corroborated Guenthner's version of events and added that he had no knowledge regarding the adjustment of inventory beyond the documents that were provided to him by Draheim.  There are no allegations that defendant Samuelson was involved in posting the BPA as a receivable in the financial statements.

Paul Anderson, a certified public accountant who was employed by KPMG, InaCom's outside auditor, at the time of the incidents at issue, also testified.  He testified that InaCom was a KPMG audit client and that he worked on the Inacom account in various capacities beginning as an assistant accountant in 1990, and ultimately as the supervising senior manager in 1999 and 2000.  He performed quarterly and annual audits at InaCom. He testified that quarterly audits are less detailed than annual audits.

Anderson testified that Inacom acquired Vanstar in what he characterized as a "pooling of interests" or "merger of equals" in February 1999.  As a result of the merger, Vanstar's and InaCom's financial statements were combined, and InaCom's revenues doubled.  Anderson testified that he was aware of the competitive pressures that occurred within the computer industry in the late 1990s.

Anderson testified that KPMG performed a quarterly review of InaCom's third-quarter financial statements in 1999.  As senior manager, he reviewed the work of supervising senior accountant Denise McGill.  KPMG completed its review of InaCom's third-quarter 1999 filings before they were filed.  KPMG signed off and approved the filings.

9

Anderson testified that he also reviewed a press release that InaCom issued on October 26, 1999. *See* Tr. Ex. 303.

Anderson further testified that he was involved with InaCom's 1999 year-end audit. Thomas Fitzpatrick had become CFO in late November or early December 1999. Fitzpatrick spoke to Anderson and to Anderson's supervisor, Pat Jung, about possible restatements of earnings that Fitzpatrick thought should be taken on InaCom's fourth-quarter financial reports. Anderson testified that he investigated the issues and made some preliminary findings. *See* Tr. Ex. 120, 121. His preliminary conclusion was that InaCom's reserve reduction, BPA posting and adjustment for inventory in InaCom's third-quarter financial statements did not comply with GAAP. Anderson's initial conclusion was that InaCom should decrease earnings of third-quarter 1999 by $25 million. Anderson further testified that his audit was never completed and that his findings remained preliminary.

Anderson also testified that the field work for the audit was not performed under normal conditions because the hardware division of Inacom had been sold to Compaq in February 2000 and many former Inacom employees were no longer working there or were employed by Custom Edge, a company owned by Compaq. In addition, Anderson was aware that a class-action shareholder suit had been filed against InaCom, and Anderson's working papers could be subpoenaed. Anderson testified that Mr. Guenthner had stated that the reserves had been reduced because they were not necessary. Anderson's superiors did not consider that explanation satisfactory.

Anderson testified that in spite of the reserve reduction, InaCom's total reserves had increased by over three million dollars. Anderson's testimony was corroborated to a large

extent by Patrick Jung, Anderson's supervisor, and Denise McGill, the supervising senior accountant who prepared the third-quarter financial statements. Other InaCom employees and board members also testified, substantiating Guenthner's testimony in important respects.

Dr. John Bazley had been identified as an expert by the Commission.[3]  He is a professor of financial   accounting at the University of Denver.   He testified that corporations, banks, and auditors follow rules and procedures known as "generally accepted accounting principles" ("GAAP") in filing financial statement and reports with the Securities Exchange Commission.   These rules are promulgated by the Financial Accounting Standards Board ("FASB").  He stated that the establishment of a reserve and the release of a reserve are governed by GAAP.  He explained that a company creates a reserve when there is an economic event that indicates that the asset value needs to be

---

[3]Also pending is defendants' motion in limine to exclude the testimony of plaintiff's expert witness, Dr. John D. Bazley.  Filing No. 128.  At the opening of trial the court reserved ruling on the motion.  This is a trial to the court.  Trial courts should be more reluctant to exclude evidence in a bench trial than a jury trial.  *See Builders Steel Co. v. Commissioner*, 179 F.2d 377, 379 (8th Cir.1950) ("[A] trial judge who, in the trial of a nonjury case, attempts to make strict rulings on the admissibility of evidence, can easily get his decision reversed by excluding evidence which is objected to, but which, on review, the appellate court believes should have been admitted").  Thus, in bench trials evidence should be admitted and then sifted when the district court makes its findings of fact and conclusions of law.  *Fields Eng'g & Equip., Inc. v. Cargill, Inc.,* 651 F.2d 589, 594 (8th Cir. 1981).  In a nonjury case, the trial court is presumed to consider only the competent evidence and to disregard all evidence that is incompetent.  *Taylor v. Taylor,* 211 F.2d 794, 797 (8th Cir. 1954).  *See also Builders Steel,* 179 F.2d at 379 (noting that the trial court, capable of ruling accurately upon the admissibility of evidence, is equally capable of sifting it accurately after it has been received, and, since findings are based on the evidence that is found competent, material and convincing, there is no harm in the presence in the record of testimony that the court does not find competent or material).  Where the court has assumed the role of fact-finder in a bench trial, "the better course" is to "hear the testimony, and continue to sustain objections when appropriate."  *Easley v. Anheuser-Busch, Inc,* 758 F.2d 251, 258 (8th Cir. 1985).

To the extent that a party challenges the probative value of the evidence, an attack upon the probative sufficiency of evidence relates not to admissibility but to the weight of the evidence and is a matter for the trier of fact to resolve. *United States v.  Beasley,* 102 F.3d 1440, 1451 (8th Cir. 1996).  Also, some evidence "cannot be evaluated accurately or sufficiently by the trial judge" in the procedural environment of a ruling on a motion in limine.  *Jonasson v. Lutheran Child and Family Servs.,* 115 F.3d 436, 439 (8th Cir. 1997).  Accordingly, the court has admitted the testimony of Dr. Bazley, and has accorded it appropriate weight.

lowered or a liability needs to be recognized.  Correspondingly, he testified that it is appropriate under GAAP to release a reserve when there is evidence that the estimate that led to the reserve is no longer appropriate.  Recording of a reserve is covered under FASB Statement No. 5, "Accounting for Contingencies."  Proper recording of a reserve requires that the contingent event must be both probable and reasonably measurable.  Dr. Bazley also testified that under GAAP a receivable must be booked at the time the revenue is realized, or once the company has either received the cash or has the right to receive the cash from the customer.  The valuation of a receivable is the amount the company expects to collect.  In order to determine that amount, a company can rely on the concept of aging of receivables, under which the longer the receivable has been outstanding, the less likely it is to be collected in full.  In addition, Dr. Bazley testified that if an accounting error is made, and the accounting in a prior period is later determined to be incorrect, the financial statement for the prior period should be adjusted or corrected.  Dr. Bazley did not state an opinion on whether InaCom's third-quarter financial statements complied with GAAP.

At the close of the Commission's case, defendants moved for judgment as a matter of law, contending that the Commission had failed to prove its case.  The court reserved ruling on the motion.  Defendants proceeded to put on their evidence.

InaCom employees John Dugan and Mike Steffan testified for defendants.  They testified that they expected to collect the bid price arbitrage amounts.  Dugan had been assured that vendors were working to streamline procedures to validate the amounts and Steffan received assurances from other executives that the rebates would be paid.  Also, the evidence establishes that InaCom in fact collected some BPA receivables.

12

Defendants also presented the expert testimony of Harris Devor. Mr. Devor is a professor of accounting at Temple University. He has been trained as an auditor and has 32 years experience in applying GAAP and GAAS[4] standards. He testified that he reviewed documents, exhibits, and deposition testimony in connection with the transactions at issue in this action. He testified that, based on a reasonable degree of accounting and auditing certainty, in his opinion no one following professional standards could conclude that the alleged accounting improprieties at issue in this action violated GAAP. Dr. Harris explained that there are two ways to establish that a reduction in reserves is inappropriate: (1) establishing that the reserve should not have been established in the first place,[5] or (2) showing that the reserves remaining after the reduction are inadequate to cover certain future liabilities or to reflect impairment of certain assets. Mr. Devor further testified that, based upon the record evidence in this case, he saw no evidence that InaCom's reserves were inadequate. He also testified that it is appropriate to record an asset if it is reasonably expected to produce an economic benefit at the time it is posted. He thus concluded that it had been proper for InaCom to record the bid price arbitrage amounts as receivables if InaCom reasonably expected to collect those receivables at the time they were recorded. He further concluded, based on the record evidence, that InaCom had a reasonable belief that the BPA was collectible and it was thus proper to record them.

Professor Kenneth Lehn also testified on behalf of defendants. He testified that the alleged misrepresentations or misstatements, either singly or in combination, by InaCom would not have been material to the average investor. He stated that investors are

---

[4]These are "Generally Accepted Auditing Standards."

[5]The Commission has abandoned this claim.

13

generally forward-looking and that the extremely negative fourth-quarter prospects reported in the press release would have negated the impact of any fifteen-cent-per-share earnings. Defendants renewed their motions for judgment as a matter of law at the close of the evidence.

## II.  CONCLUSIONS OF LAW

Section 10(b) of the Securities Exchange Act prohibits fraudulent conduct in the sale and purchase of securities.  *See* 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated under that section, provides that it is unlawful for any person "to employ any device, scheme, or artifice to defraud," "to make any untrue statement of a material fact . . . or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5; *see Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653 (8th Cir. 2001).  Section 10(b) was intended to proscribe knowing or intentional misconduct.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976).  Scienter, defined as the intent to deceive, manipulate, or defraud, is an essential element of a section 10(b) claim.  *Florida State Bd. of Adm. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653 (8th Cir. 2001).

In order to succeed on its claim, the Commission must prove:  (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; and (3) scienter on the part of the defendants.  *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002).  Mere negligence does not violate Rule 10b.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976); *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395

F.3d 851, 854 (8th Cir. 2005).  Severe recklessness, however, which is "'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it' may [amount to securities fraud]." *Id.* (quoting *Green Tree*, 270 F.3d at 654).  *See also SEC v. GLT Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001) ("Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.") (quotation omitted).  This level of recklessness requires that defendants make statements that they know are materially inaccurate, or that they have access to information that suggests the statements are materially inaccurate.  *Ferris, Baker Watts*, 395 F.3d at 854.

Thus, to give rise to section 10(b) liability for fraud, the mere second-guessing of calculations will not suffice; the Commission must show that defendants' judgment—at the moment exercised—was sufficiently egregious that a reasonable accountant reviewing the facts and figures should have concluded that the company's financial statements were misstated and that as a result the public was likely to be misled.  *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002); *see also Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (rejecting "fraud by hindsight" because the law does not expect clairvoyance).

15

Under 17 C.F.R. § 210.4-01(a)(1), financial statements to the SEC must be made in accordance with GAAP. *In re Acceptance Ins. Companies Sec. Litig.,* --- F.3d ----, 2005 WL 2060912 (8th Cir. Aug 29, 2005)). Financial results reported in violation of GAAP are presumptively misleading or inaccurate. *See* 17 C.F.R. § 210.10-01(a)(1); *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 153 (3d Cir. 2004). Violations of GAAP standards can also provide evidence of scienter. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999).

The Financial Accounting Standards of GAAP and the antifraud rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated. *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994). Nevertheless, the prohibitions contained in the GAAP and in Section 10(b) are not perfectly coextensive. *Id.* In some circumstances, courts have found defendants liable for securities fraud under § 10b despite having complied with GAAP, while in other circumstances, courts have discharged defendants from § 10b liability notwithstanding deliberate violations of GAAP. *Id.* "Even when a company's disclosure is in violation of GAAP, 'some techniques . . . might prove to be entirely legitimate, depending on the specific facts.'" *Baron v. Smith*, 380 F.3d 49, 55-56 (1st Cir. 2004) (*quoting In re Cabletron*, 311 F.3d 11, 34 (1st Cir. 2002).

"GAAP is a term of art that encompasses a wide range of acceptable procedures." *In re Ikon Office Solutions, Inc.,* 277 F.3d at 675; *see also Thor Power Tool Co. v. Comm'r,* 439 U.S. 522, 544 (1979) (GAAP "are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions . . . [GAAP], rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to

16

management"); *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc) (as accounting concepts are flexible, circumstances will give rise to fraud only where differences in calculations are the result of a falsehood, "not merely the difference between two permissible judgments"); *Godchaux v. Conveying Techniques*, *Inc.*, 846 F.2d 306, 315 (5th Cir.1988) (a reasonable accountant may choose to apply any of a variety of acceptable procedures when preparing a financial statement).  "There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question . . . [w]hen such conflicts arise, the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995).  The sources for GAAP include official publications consisting of APB opinions, FASB Statements and Accounting Research Bulletins (ARB).  *In re K-tel Int'l Sec. Lit.*, 300 F.3d at 890.[6]

Under the Federal Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  Fed. R. Evid. 702.

---

[6]FAS 5 establishes standards of financial accounting and reporting for loss contingencies.  *See In re K-Tel Int'l Sec. Lit.*, 300 F.3d at 892.  FAS 5 "[r]equires accrual by a charge to income (and disclosure) for an estimated loss from a loss contingency if two conditions are met:

(a)     information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements, and

(b)     the amount of loss can be reasonably estimated.

*Id.*; FAS 5, available at http://www.fasb.org.

Generally, expert testimony is required to establish the relevant standard of care applicable to a professional. *See, e.g., Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001) (involving a medical doctor); *Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 296 (8th Cir. 1989) (involving a computer systems consultant). Establishing that an accounting practice or method is inconsistent with GAAP requires expert testimony. *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1421 (3d Cir. 1997); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 n.9 (3rd Cir.1996) (characterizing GAAP proof as a battle of experts); *Green Tree Fin.,* 270 F.3d at 666 (same); *Rumsfeld v. United Technologies Corp.,* 315 F.3d 1361, 1369 n.6. (Fed. Cir. 2003) (stating that expert testimony can be considered to establish the requirements of GAAP).

A misrepresentation is considered "material," if it has been established that there is a substantial likelihood that the misrepresentation would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir.1997) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). A determination of materiality requires delicate assessments of the inferences that a reasonable shareholder would draw from a given set of facts and the significance of those inferences to the shareholder. *Parnes,* 122 F.3d at 546-48. Although materiality generally presents a factual question, the issue may be decided as a matter of law in an appropriate case upon a showing that "a reasonable investor could not have been swayed by an alleged misrepresentation" or omission. *Id.* 546; *see also Rodney v. KPMG Peat Marwick,* 143 F.3d 1140, 1144 (8th Cir. 1998). Cautionary language that relates directly to the issue on which plaintiff claims to have been

misled can render the alleged misrepresentation or omissions immaterial as a matter of law. *In re AMDOCS Ltd. Securities Litigation*, 390 F.3d 542, 547 (8th Cir. 2004).

Under Rule 50 of the Federal Rules of Civil Procedure, judgment as a matter of law should be granted if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable [fact-finder] to find for that party on that issue." Fed. R. Civ. P. 50(a)(1); *see First Union Bank v. Benham*, — F.3d —, 2005 WL 2206891, *5 (8th Cir. Sept. 13, 2005). The court must draw all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence. *Id.* A reasonable inference is one that can be drawn from the evidence without resort to speculation. *See id.* Judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict. *Id.*

### III.  ANALYSIS

The court finds that defendants' motions for judgment as a matter of law should be sustained. There has been a complete and utter failure of proof by the Commission. The Commission has failed to prove any of the elements of its securities fraud claims. Most notably, the Commission has not shown that Guenthner or Samuelson made any misstatements or misrepresentations in InaCom's third-quarter 1999 filings. The Commission's claim is based on its contention that defendants had misstated or "managed" earnings in the third-quarter 1999 report.[7] The alleged misstatements of

---

[7]The Commission's primary claim is its fraud claim under § 10(b). The Commission's contentions that Samuelson and Samuelson's conduct violated other provisions of the federal securities laws are dependent on proof of the § 10(b) violation. Accordingly, the court's resolution of the fraud claim disposes of the Commission's other claims as well.

earnings were premised on three allegedly improper, false, or erroneous accounting procedures.

The Commission has presented no evidence that InaCom's accounting procedures did not comply with GAAP. The Commission's only designated expert witness, Dr. Bazley, testified generally about GAAP and about basic principles of accounting, but he offered no opinion on whether the defendants' conduct in connection with the third-quarter 1999 financial reports complied with GAAP. Whether defendants' actions as professional and certified accountants in preparing InaCom's third-quarter 1999 financial reports complied with GAAP is a question that requires technical, and specialized knowledge. The standards of conduct of a professional under these circumstances is not within the court's general knowledge and experience. The need for expert testimony in this case is analogous to the need for expert testimony on the standard of care in a professional malpractice case. With respect to the reduction of reserves, Dr. Bazley testified only that the creation or reduction of a reserve must be based on a reason. Guenthner testified that he had a reason for the creation and the reduction of the reserves and that InaCom was adequately reserved. The Commission made no showing that Guenthner's reason for releasing the reserve was in any way inadequate or suspect.

Moreover, Mr. Anderson testified only as a fact witness and not as an expert. Even if he were qualified, and had been disclosed, as an expert, his preliminary conclusions that the three accounting procedures at issue did not comply with GAAP do not amount to proof of those conclusions because they were admittedly preliminary and tentative. Moreover, any testimony by KPMG employees is suspect and cannot be afforded much weight in view of the fact that KPMG has considerable exposure to liability for the fraud, if it were shown

to have occurred.  The evidence shows that KPMG was aware of and approved the accounting procedures that it later professed, in hindsight, to have been erroneous and improper.

Further, the Commission has not shown that the misrepresentations, if made, were material.  The Commission's proof of the materiality of the alleged errors consists only of its bare assertion that it is obvious that a reasonable investor would find earnings and profitability important.  In fact, the precipitous drop in InaCom's stock value after the release of the earnings statement shows the lack of impact of the alleged overstatement of earnings.  It is clear to the court that any impact of false or inflated earnings in the third-quarter financial reports was negated by the pessimistic predictions of fourth-quarter profits that were revealed in the contemporaneous press release.  The effect of any misstatement was also obviated by the fact that earnings did not meet analysts' expectations in any event.  When viewed in the context of the entire mix of information available to the investor, InaCom's third-quarter 1999 fifteen-cents-per-share earnings are not significant.  The documentary evidence shows that InaCom did not hide the fact that its operations were not generating a profit from investors.  *See* Tr. Ex. 304 at 3 (showing an operating loss of $134 million).  A reasonable investor, familiar with financial statements and investment reports, could easily ascertain that InaCom's third-quarter 1999 earnings were not due to an operating profit, but to accounting charges posted by the company.  *Id.*

Even if a material misrepresentation had been proven, the Commission has not presented any evidence from which the court could infer scienter.  Neither Guenthner nor Samuelson made any money on the InaCom stock.  No evidence of any other indicia of scienter was presented.  The evidence shows only that InaCom suffered a business

21

reversal largely due to circumstances beyond its control in the rapidly evolving and highly competitive technology market.  The evidence also reveals disagreement, infighting, and differences in management styes between the managers and executives of two merged corporations.   The Commission has, at most, shown mismanagement or marginal negligence in accounting, but has not shown securities fraud.  Accordingly, the court finds that defendants' motions for judgment as a matter of law should be granted. [8]

IT IS ORDERED:

1.      Defendants' motion in limine (Filing No. 128) is denied;

2.      Defendants' motions, pursuant to Fed. R. Civ. P. 50, for judgment as a matter of law are granted;

3.      A judgment in conformity with this Memorandum Opinion and Order will issue this date.

DATED this 26th day of September, 2005.

BY THE COURT:


s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
United States District Judge

---

[8] Alternatively, the court notes that it would find in favor of defendants based on all the evidence adduced in this case.